IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Kobe, Mark, and John, ) | |
| ) | C/A No. 3:11-1146 |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | **ORDER AND OPINION** |
| Nikki Haley, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

Plaintiffs Kobe, Mark, and John are persons with severe disabilities who receive Adult Day Health Care (ADHC) services. Plaintiffs brought the within action on May 11, 2011, as amended on October 18, 2011, against numerous state officials and other individuals involved in the oversight and administration of the South Carolina Medicaid system, and, in particular, persons associated with the South Carolina Department of Health and Human Services (DHHS); the South Carolina Department of Disabilities and Special Needs (DDSN); and the Babcock Center, a private nonprofit organization that provides housing, training, and work opportunities for disabled persons. Plaintiffs allege wide-spread corruption, negligence, and criminal conduct within the DHHS and DDSN systems. Among other things, Plaintiffs assert:

- In October 2003, DHHS reported that the Babcock Center did not have a policy to define and report serious abuses between clients to external authorities, that they failed to report these incidents as required by state law and they failed to follow up on correction plans. DHHS repeated the finding that staffing ratios required by vulnerable clients were inadequate and that the Babcock Center did not properly monitor these more vulnerable clients to assure their health and welfare.

- On January 18, 2005, Carolina Medical Review (CMR) released its findings of its investigations of Babcock Center intermediate care facilities for persons with mental retardation (ICF/MR facilities), reporting that there was no comprehensive set of

       policies and procedures for the administration of Babcock Center programs, as required by the federal Conditions of Participation. CMR reported that Babcock Center facilities had a vast number of staff with multiple disciplinary actions who appear to receive excellent employee evaluations. According to Plaintiffs, CMR concluded that Babcock Center was not meeting the minimal conditions of participation in the Medicaid program.

- In 2008, the Legislative Audit Council reported that more than $9 million allocated by the General Assembly to provide services for children with autism were unused or used for different purposes, and that during fiscal years 2005-2006 and 2006-2007, DDSN spent approximately $1.5 million for grants to private, non-profit organizations that were not authorized by the General Assembly; and further, that there existed serious health and safety problems with licensing and failing to conduct SLED checks on employees in DDSN programs.

- Defendants acted in concert to terminate the ADHC services of Plaintiffs in a scheme to force them to attend DDSN "Work Activity Centers" (WAC's) for the financial gain of DDSN and its local Disabilities and Special Needs (DSN) Boards. DDSN spent tens of millions of dollars intended and allocated by the General Assembly for the purpose of providing home and community based services buying WAC's instead.

- As a result of the termination of ADHC services and the failure of Defendants to provide other appropriate and necessary home and community based waiver services, Defendants will actually increase the costs to state taxpayers because the associated increases in hospitalization and institutional services Plaintiffs will require.

- In 2009, DDSN was holding, in addition to millions of dollars of unspent federal stimulus funds, an excess funds account containing $7.8 million which could have been used to avoid reductions in services. Instead, $2.6 million of these excess funds were used to purchase more WAC's. These transfers of public funds included $800,000 to be paid to the Babcock Center to purchase a WAC, $1 million to the Horry County DSN Board and $800,000 to the Beaufort County DSN Board for the purpose of purchasing and/or renovation of WAC's which would compete with private providers of ADHC services.

- Hundreds of the most vulnerable citizens of the State have been placed at risk of being forced into sheltered workshops, where they will be paid subminimum wages and their medical needs will not be met because they have been forced into WAC's or else have been left without day program services.

- When the costs of the DSN Board WAC's which were purchased with tax dollars are considered, the cost of ADHC services is actually less than the cost of WAC services

>> which DDSN and the individual Defendants are attempting to force medically fragile waiver participants to receive.
>
> • WAC's warehouse people with disabilities, limiting their opportunities and putting them in danger of abuse and neglect, while providing financial gain for employers, i.e., Defendants Johnson, Buscemi, Lacy, Waring, Haley, and Forkner, all of whom allegedly have benefitted from the exploitation of persons attending WAC's.

See generally ECF No. 65.

Plaintiffs claim that DDSN attempted to terminate their ADHC services and those of other disabled persons in the area of Richland and Lexington Counties, South Carolina, in anticipation of the Babcock Center opening a WAC purchased with funds provided by the Budget and Control Board without approval by the General Assembly. Plaintiffs contend DDSN's reasons for terminating ADHC services were pretextual and that disqualified ADHC participants were offered day services at the Babcock Center WAC for the purpose of exploitation.

Plaintiffs allege the following causes of action: Violation of the Americans With Disabilities Act (Count One); Violation of Section 504 of the Rehabilitation Act (Count Two); Violation of 42 U.S.C. § 1983 (Count Three); Violation of 42 U.S.C. §§ 1983 and 1988 (violation of civil rights) (Count Four); Violation of 42 U.S.C. § 1985(3) (conspiracy) (Count Five); Violation of the Supremacy Clause (Count Six); and Violation of RICO (Count Seven). Plaintiff Kobe also asserts state law claims against the Babcock Center, a private entity that provides services to persons with disabilities, as follows: Injuries to Kobe Caused by Babcock Center, Judy Johnson and/or Agents and Employees of The Babcock Center Resulting From Neglect, Deliberate Indifference, Assault and Battery and Intentional Infliction of Emotional Distress (Count Eight).

The amended complaint contains class action allegations in the body of the complaint. See Fed. R. Civ. P. 23. However, Plaintiffs sought no class certification and have confirmed to the court

that the within action is brought by Plaintiffs on behalf of themselves, and not on behalf of others similarly situated. Plaintiffs seek the following relief:

1. Issue an order of protection prohibiting DDSN and its agents and employees from retaliating against the Plaintiffs or their families.

2. Assume jurisdiction over this action and maintain continuing jurisdiction until the Defendants are in full compliance with every order of this Court.

3. Issue an injunctive order declaring that Defendants' policies, practices, acts and omissions, as set forth above, violate Plaintiff's *[sic]* rights under the ADA and Section 504 of the Rehabilitation Act and the Medicaid Act.

4. Plaintiffs request an order prohibiting the Defendants from reducing ADHC services and requiring Defendants to provide such additional services as shall be medically necessary, as shall be determined by their treating physicians, so as to allow Plaintiffs and Class Members to live in the most integrated settings possible in order to prevent regression and to allow them to function with the most independence possible.

5. So long as the cost of these services is less than the cost of ICF/MR services, Plaintiffs and Class Members request that an order requiring Defendants to provide Medicaid waiver services as shall be determined by the treating physicians to be necessary absent review and an order from the Court during this litigation.

6. Plaintiffs and Class Members request additional services which shall be determined to be just and appropriate by the Court.

7. Plaintiffs and Class Members request that this Court disgorge Defendants and their associated enterprises or organizations of ill gotten gains.

8. Plaintiff's *[sic]* request the relief requested in this complaint and such other relief as shall be determined by this Court to be just and equitable, including payment of legal fees and costs of this action.

9. Plaintiffs and Class Members request actual and punitive damages in such amount as shall be determined by a jury.

10. Plaintiff Kobe requests the relief requested in Count Eight of this Complaint.

11. Plaintiffs and Class Members request such other relief as the Court shall

>    determine to be just and right.

ECF No. 65 at 70-72.

Defendants Nikki Haley, in her capacity as Governor and Chairman of the South Carolina Budget and Control Board; Daniel Cooper and Converse Chellis, in their capacities as former members of the South Carolina Budget and Control Board; and Curtis Loftis and Brian White, in their capacities as members of the South Carolina Budget and Control Board, were dismissed from the case on August 10, 2012 on the grounds of Eleventh Amendment and legislative immunity. ECF No. 135. Plaintiff John withdrew from the case on July 19, 2013. ECF No. 215. Defendants Hugh Leatherman and Richard Eckstrom, in their capacities as members of the South Carolina Budget and Control Board, were dismissed from the action on August 12, 2013 on the grounds of Eleventh Amendment and legislative immunity. ECF No. 217. Thus, remaining in the case are Plaintiffs Kobe and Mark, as well as Defendants Anthony Keck, in his capacity as the Director of the South Carolina Department of Health and Human Services; Emma Forkner, in her capacity as the former Director of the South Carolina Department of Health and Human Services; Beverly Buscemi, in her capacity as Director of the South Carolina Department of Disabilities and Special Needs; Eugene A. Laurent, former Interim Director of the South Carolina Department of Disabilities and Special Needs; Stanley Butkus, former Director of the South Carolina Department of Disabilities and Special Needs; Richard Huntress, in his capacity as Commissioner of the South Carolina Department of Disabilities and Special Needs; Kathi Lacy, Thomas P. Waring and Jacob Chorey, in their capacities as employees of the South Carolina Department of Disabilities and Special Needs; Mary Leitner, in her capacity as the Director of the Richland Lexington Disabilities and Special Needs Board; the Babcock Center; Judy Johnson, in her capacity as the Director of the Babcock Center; and other

Unnamed Actors Associated with the Babcock Center.

Former Governor Mark Sanford appears in the caption of Plaintiffs' amended complaint in his capacity as prior member of the South Carolina Budget and Control Board. There being no evidence that Defendant Sanford was served with copies of the summons and complaint, he is **dismissed** pursuant to Fed. R. Civ. P. 4(m).

This matter came before the court on September 23, 2014, on the following motions:

1.  Motion for summary judgment filed by Defendants Keck and Forkner on January 6, 2014. ECF No. 236. Plaintiffs filed a response on March 10, 2014, to which a reply was filed on April 24, 2014.

2.  Motion for summary judgment filed by Defendants Buscemi, Butkus, Chorey, Huntress, Lacy, Laurent, and Waring on January 6, 2014. ECF No. 237. Plaintiffs filed a response on March 17, 2014, to which a reply was filed on April 24, 2014.

3.  Motion for summary judgment filed by Defendant Leitner on January 6, 2014. ECF No. 238. Plaintiffs filed a response on March 17, 2014, to which a reply was filed on April 24, 2014.

4.  Motion for summary judgment filed by Defendants Babcock Center, Johnson, and Unnamed Actors on January 6. 2014 ECF No. 239. Plaintiffs filed a response on March 17, 2014, to which a reply was filed on April 24, 2014.

5.  Motion for summary judgment filed by Plaintiffs on January 22, 2014. ECF No. 250. Defendants filed responses on March 17, 2014, to which a reply was filed on April 24, 2014.

6.  Motion to exclude witnesses and strike exhibits filed by Defendants Forkner and Keck on March 10, 2014. ECF No. 258. A response was filed on April 24, 2014.

7.  Motion to be excused from mediation filed by all Defendants on July 15, 2014. Plaintiffs filed a response on July 31, 2014, to which a reply was filed on August 11, 2014.

This matter came before the court for a hearing on September 23, 2014. The court has considered the motions, memoranda, arguments of counsel, and applicable law. The court concludes

that, for the following reasons and to the extent noted, Defendants' motions for summary judgment should be granted and Plaintiff's motion for partial summary judgment denied, except as to (1) Kobe's state law claims contained in Count Eight; and (2) Kobe's request for an augmentative communications device (ACD) device.

## I. FACTS

Kobe's and Mark's individual claims can be stated succinctly. At the time of filing the amended complaint, Kobe was 29 years old. Kobe is unable to walk or to speak and has a history of convulsions. Kobe attends the Hope Bridge Adult Day Care program and receives ADHC services. In December 2010, the Richland-Lexington Disabilities and Special Needs Board was directed by DDSN to update eligibility of persons using ADHC services. Kobe was informed by the Richland-Lexington Disabilities and Special Needs Board that he no longer was eligible for ADHC services. Kobe appealed the termination of services to DDSN, and Defendant Buscemi determined on May 11, 2011, that Kobe should continue to receive ADHC services. Despite being successful at the DDSN level, Kobe appealed the termination of services to DHHS. The issue was resolved by consent order dated August 9, 2012. See ECF No. 236-2. It is undisputed that there was no lapse in ADHC services for Kobe during this time.

Kobe also alleges that he requested from DHHS an(ACD) to aid him in communicating. He states that the ACD he received was not as sophisticated as that prescribed by his treating physician. An ACD device acceptable to Kobe now has been supplied to him; however, at the time of the hearing the ACD device had not been installed on his wheelchair so as to be accessible to him. At the hearing, Defendants' counsel informed the court that the wheelchair was to be equipped with the necessary attachment in the near future. Kobe further contends that his wheelchair was damaged

when he was dropped by employees of the Babcock Center while being loaded into a vehicle, and that it was not replaced promptly by DHHS. At the time of the hearing, Kobe was in possession of a new wheelchair.

Mark also receives ADHC services. Like Kobe, Mark was notified in 2011 that he no longer was eligible for ADHC services. Mark appealed the termination to DDSN, which upheld the termination. However, the issue was resolved in Mark's favor at the DHHS level by consent order. See ECF No. 236-2. Mark's ADHC services did not lapse during this time period.

Mark lives with his sister. Mark contends that in 2010 DDSN reduced the number of respite hours to which he is entitled. Mark asserts that he is at risk of institutionalization if his sister is not provided with the support and services that he needs. See generally ECF No. 65, ¶¶ 19-76.

Plaintiffs contend that the court should resolve the following issues:

(1) Have the Defendants violated the reasonable standards provision of 42 U.S.C. § 1396a(a)(17) of the Medicaid Act and the South Carolina Administrative Procedures Act by failing to establish and utilize reasonable, ascertainable, non-arbitrary standards and procedures to determine eligibility for and the extent of medical assistance provided to Plaintiffs?

Plaintiffs state that the court should "issue a permanent injunction against Defendants denying medical services ordered by Plaintiffs' treating physicians based on binding norms that have not been promulgated as regulations. Plaintiffs request that the Defendants be required to give the deference ordered by the United States Supreme Court to the orders of Plaintiffs' treating physicians. Plaintiffs request that Defendants be prohibited from denying medically necessary services based on amendments made by the agencies without promulgation of regulations." ECF No. 250 at 27.

(2) Have the Defendants violated the "reasonable promptness" requirement of the Medicaid Act by failing to provide Kobe with the wheelchair and speech device his physician ordered and by failing to provide residential services in

the least restrictive setting within ninety days of those needs being identified?

Plaintiffs state that Kobe's physicians have ordered a wheelchair and speech device, but DHHS has failed to provide this equipment with reasonable promptness. Plaintiffs state that Kobe is entitled to be placed in an SLP. Plaintiffs request the court "order Defendants to immediately provide Kobe with (1) a wheelchair to be provided within 30 days without further administrative delays, (2) speech device ordered by his physician within thirty days and speech services determined by his physician to be medically necessary, based on the evaluation by his licensed speech and language pathologist; (3) immediate payment to Ron Kuebler, a provider of speech and language services, for the evaluation and speech services provided to Kobe; and (4) immediate funding for placement in a supervised living program operated by United Cerebral Palsy [UCP] with supports provided as determined to be necessary by his treating physician. Plaintiffs request that until DDSN and DHHS promulgate regulations, the agencies provide all medically necessary services to the Plaintiffs within 90 days of receipt of a physician's order, with the agencies having the burden to prove that such services or equipment is not medically necessary." ECF No. 250 at 28.

(3)     Have the Defendants violated the integration mandate of the Americans with Disabilities Act by failing to provide Kobe with a wheelchair, a speech device, speech therapy services and placement in a supervised apartment with necessary support services?

Plaintiffs state: "Kobe requests that this Court issue a declaratory order finding that Defendants have violated the ADA in the operation of their programs and enjoining them from continuing to violate the ADA. He requests that DHHS be ordered to pay for the wheelchair and speech device ordered by his physician to be funding by Defendants. He requests continued speech services to improve his ability to communicate. Kobe requests funding to provide the SLP services

9

proposed by UCP." ECF No. 250 at 31

> (4)  Did Kobe suffer compensable injuries, including the intentional infliction of emotional distress, resulting from the neglect and the deliberate and conscious indifference of Judy Johnson and the Babcock Center and the assault and battery he experienced at the Babcock Center and was he subjected to intentional infliction of emotional distress?

According to Plaintiffs, "Kobe was subjected to indignities that no human being should have to suffer. Kobe has provided evidence showing that Judy Johnson and the Babcock Center intentionally inflicted emotional distress and psychological injury. Johnson and the Babcock Center intentionally and recklessly subjected Kobe to emotional distress and they were certain or reasonably certain that such distress would result from their conduct. Their conduct was so extreme and outrageous as to exceed all po[s]sible bounds of decency and it was atrocious and utterly intolerable in a civilized society. No man should be expected to endure the psychological and physical injury Kobe suffered." ECF No. 250 at 32-33.

## II.  DISCUSSION

A.  Mootness

It is well settled that federal courts have no authority to "'give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" Int'l Coal. for Religious Freedom v. Maryland, 3 F. App'x 46, 48-49 (4th Cir. 2001) (quoting Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992)). This is so even though such case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot. Id. (citing Calderon v. Moore, 518 U.S. 149, 150 (1996)).

In this case, Plaintiffs were informed in 2010 that they no longer qualified for ADHC

assistance. However, their ADHC services were never interrupted, and they both prevailed during the administrative appeals process. Further, it appears that Kobe has received a new wheelchair. The court finds these claims to be moot.[1]

B.     Ripeness

The ripeness doctrine aims to "'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'" Pasby v. Delia, 709 F.3d 307, 317 (4th Cir. 2013) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact "'remains wholly speculative.'" Doe v. Virginia Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013) (quoting Gasner v. Bd. of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996)). In determining ripeness, a court must "'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration. A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'" Id. (quoting Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006)).

Mark's contention that the reduction in his respite hours could lead to the loss of care by his sister is too remote and speculative to be ripe for federal judicial review. See Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208-09 (4th Cir. 1992) ("'[I]n the context of an administrative case, there must be 'an administrative decision [that] has been formalized and its

---

[1] As to Kobe's remaining contentions, i.e., his desire to be placed in an SLP and his demand for immediate payment to Ron Kuebler, these claims were not raised until Plaintiffs' motion for partial summary judgment and thus are not properly before the court. Kobe may raise these claims in a separate complaint, should he desire to do so.

effects felt in a concrete way by the challenging parties.'")(quoting Pac. Gas & Elec. v. Energy Res. Comm'n, 461 U.S. 190, 200 (1983)). C.     Standing to Invoke Injunctive Relief

To satisfy Article III's case-or-controversy standing requirements, a plaintiff must show (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (4th Cir. 2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). The standing question is whether the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). Further, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." Id. at 499 (citing cases). In addition, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Id. (citing cases). "Without such limitations–closely related to Art[icle] III concerns but essentially matters of judicial self-governance–the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Id. at 500 (citing Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 209, 222 (1974) ("'The desire to obtain sweeping relief

cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks.'") (quoting McCable v. Atchison, T. & S.F.R. Co., 235 U.S. 151, 164 (1914)).

As can readily be discerned from the allegations set forth hereinabove, and further as argued in the hearing, Plaintiffs allege systemic failures within the DHHS and DDSN systems and ask the court to intervene in the administration and operation of these agencies of the State of South Carolina. In particular, Plaintiffs seek to have the court oversee DHHS's promulgation of regulations that Plaintiffs contend would force compliance with federal Medicaid law. While Plaintiffs' allegations of wholesale mismanagement and, indeed, criminal conduct within DHHS, DDSN, and the Babcock Center are sobering,"[i]t is an established principle . . . that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as a result of that action." Lujan, 504 U.S. at 574-76. Plaintiffs show no cognizable particularized injury. Plaintiffs lack standing to seek injunctive relief on behalf of others regarding the allegations of mishandling of funds and exploitation set forth in the amended complaint.[2]

D.     Tort Claims against Defendants Babcock Center, Johnson, and Unnamed Actors (the "Babcock Defendants")

In Count Eight, Kobe asserts state law claims for negligence, intentional infliction of emotional distress, assault and battery regarding events that occurred while he was in custody of employees of the Babcock Center. The court finds Kobe's state law claims are sufficiently related to the same case or controversy as his claims regarding the administration of his Medicaid services

---

[2] These types of allegations are typically brought in class action lawsuits. See, e.g., Alexander S. v. Boyd, C/A No. 3:90-3062-17.

such the court may exercise supplemental jurisdiction in accordance with 28 U.S.C. § 1367. The court concludes that there exist genuine issues of material fact as to the liability of the Babcock Defendants that require resolution by a jury.

### III.  CONCLUSION

For the reasons stated hereinabove, Defendants' motions for summary judgment (ECF No. 236, 237, 238, 239) are **granted** on the grounds of mootness, ripeness, and/or standing. The court makes no findings regarding the merits of allegations Plaintiffs lack standing to assert. Plaintiffs' motion for summary judgment (ECF No. 250) is **denied** except as to Kobe's allegations contained in Count Eight, which will be placed on the jury trial roster.

As noted hereinabove, Kobe's ACD device was not installed on his wheelchair at the time of the hearing and thus is not accessible to him. The court **orders** that the ACD device be properly affixed to Kobe's wheelchair no later than ten (10) days from the date of entry of this order.

Defendants' remaining motions excluded witnesses and to strike, and to be excused from mediation (ECF Nos. 258, 289) **are denied as moot**.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

September 30, 2014