IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| Kobe, Mark,[1] | ) |
| | ) C/A No. 3:11-1146-MBS |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| Henry McMaster, in his capacity as | ) |
| Governor[2] of the State of South Carolina, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## ORDER AND OPINION

Plaintiffs Kobe and Mark filed a complaint on May 11, 2011, and an amended complaint on October 18, 2011. Plaintiffs alleged the following causes of action: Violation of the Americans With Disabilities Act (Count One); Violation of Section 504 of the Rehabilitation Act (Count Two); violation of 42 U.S.C. § 1983 (Count Three); Violation of 42 U.S.C. §§ 1983 and 1988 (violation of civil rights) (Count Four); Violation of 42 U.S.C. § 1985(3) (conspiracy) (Count Five); Violation of the Supremacy Clause (Count Six); and Violation of RICO (Count Seven).[3]

---

[1] Plaintiff Mark filed a motion to withdraw as a party to this action on July 19, 2013. The motion was granted on July 23, 2013.

[2] Governor McMaster was substituted for former Governor Nikki Haley pursuant to Fed. R. Civ. P. 25(d) on July 25, 2017.

[3] Plaintiff Kobe also asserted state law claims against the Babcock Center, a private entity that provides services to persons with disabilities, as follows: Injuries to Kobe Caused by Babcock Center, Judy Johnson and/or Agents and Employees of The Babcock Center Resulting From

The case originally was assigned to the Honorable J. Michelle Childs.  It was reassigned to the Honorable Timothy M. Cain on October 18, 2011.

On August 10, 2012, the Honorable Timothy M. Cain dismissed Defendants Nikki Haley, in her official capacity as Governor and Chairman of the South Carolina Budget and Control Board;[4] Curtis Loftis and Brian White, as members of the South Carolina Budget and Control Board; and Daniel Cooper and Converse Chellis, in their capacities as former members of the South Carolina Budget and Control Board, on the grounds of Eleventh Amendment immunity as to claims asserted against them in their official capacities.  He determined none of them had a special connection to the administration of the state's Medicaid program such than an injunction against them would provide any redress.  Judge Cain also found that, to the extent Defendants Cooper and Chellis were sued in their individual capacities, these Defendants had no authority to provide prospective injunctive relief. Judge Cain also determined that Defendants Cooper and Chellis were entitled to legislative immunity.  ECF No. 135.  On August 12, 2013, Judge Cain dismissed Defendants Hugh Leatherman and Richard Eckstrom, in their capacities as members of the South Carolina Budget and Control Board, on the grounds of Eleventh Amendment immunity and legislative immunity.  ECF No. 217.

On July 7, 2014, the within action was reassigned to the undersigned.  Remaining in the case were Plaintiffs Kobe and Mark, as well as Defendants Anthony Keck, in his capacity as the Director of the South Carolina Department of Health and Human Services; Emma Forkner, in her

Neglect, Deliberate Indifference, Assault and Battery and Intentional Infliction of Emotional Distress (Count Eight).  Count Eight was dismissed with prejudice on March 20, 2015.

[4] Reorganized as the State Fiscal Accountability Authority.

capacity as the former Director of the South Carolina Department of Health and Human Services; Beverly Buscemi, in her capacity as Director of the South Carolina Department of Disabilities and Special Needs; Eugene A. Laurent, former Interim Director of the South Carolina Department of Disabilities and Special Needs; Stanley Butkus, former Director of the South Carolina Department of Disabilities and Special Needs; Richard Huntress, in his capacity as Commissioner of the South Carolina Department of Disabilities and Special Needs; Kathi Lacy, Thomas P. Waring and Jacob Chorey, in their capacities as employees of the South Carolina Department of Disabilities and Special Needs; Mary Leitner, in her capacity as the Director of the Richland Lexington Disabilities and Special Needs Board; the Babcock Center; Judy Johnson, in her capacity as the Director of the Babcock Center; and other Unnamed Actors Associated with the Babcock Center.[5]

## FACTS AND PROCEDURAL HISTORY

At the time of filing the amended complaint, Kobe was 29 years old. Kobe is unable to walk or to speak and has a history of convulsions. Kobe attends the Hope Bridge Adult Day Care program and receives Adult Day Health Care (ADHC) services. In December 2010, the Richland-Lexington Disabilities and Special Needs Board was directed by the South Carolina Department of Disabilities and Special Needs (DDSN) to update eligibility of persons using ADHC services. Kobe was informed by the Richland-Lexington Disabilities and Special Needs Board that he no longer was eligible for ADHC services. Kobe appealed the termination of services to DDSN, and Defendant Beverly Buscemi, Director of DDSN, determined on May 11, 2011, that Kobe should

---

[5] Defendant former Governor Mark Sanford, in his official capacity as former member of the South Carolina Budget and Control Board, was never served. Accordingly, he was dismissed pursuant to Fed R. Civ. P. 4(m) on September 30, 2014.

continue to receive ADHC services. Despite being successful at the DDSN level, Kobe appealed the termination of services to the South Carolina Department of Health and Human Services (DHHS). The issue was resolved by consent order dated August 9, 2012. There was no lapse in ADHC services for Kobe during this time.

Kobe also alleged that he requested from DHHS an augmentative communications device (ACD) to aid him in communicating. He received an ACD that was not as sophisticated as that prescribed by his treating physician. Kobe further contended that his wheelchair was damaged when he was dropped by employees of the Babcock Center while being loaded into a vehicle, and that the wheelchair was not replaced promptly by DHHS.

Mark also receives ADHC services. Like Kobe, Mark was notified in 2011 that he no longer was eligible for ADHC services. Mark appealed the termination to DDSN, which upheld the termination. However, the issue also was resolved in Mark's favor at the DHHS level by consent order. Mark's ADHC services did not lapse during this time period.

Mark lives with his sister. Mark contended that in 2010 DDSN reduced the number of respite hours to which he is entitled. Mark asserted that he is at risk of institutionalization if his sister is not provided with the support and services that he needs.

The matter came before the court on motions for summary judgment filed by Defendants on January 6, 2014. Plaintiffs also filed a motion for summary judgment on January 6, 2014, which was amended on January 22, 2014. The court held a hearing on September 23, 2014. Plaintiffs contended that the court should resolve the following issues:

(1)     Have the Defendants violated the reasonable standards provision of 42 U.S.C. § 1396a(a)(17) of the Medicaid Act and the South Carolina Administrative Procedures Act by failing to establish and utilize reasonable,

ascertainable, non-arbitrary standards and procedures to determine eligibility for and the extent of medical assistance provided to Plaintiffs?

Plaintiffs stated that the court should "issue a permanent injunction against Defendants denying medical services ordered by Plaintiffs' treating physicians based on binding norms that have not been promulgated as regulations. Plaintiffs requested that Defendants be required to give the deference ordered by the United States Supreme Court to the orders of Plaintiffs' treating physicians. Plaintiffs request that Defendants be prohibited from denying medically necessary services based on amendments made by the agencies without promulgation of regulations."

(2)     Have the Defendants violated the "reasonable promptness" requirement of the Medicaid Act by failing to provide Kobe with the wheelchair and speech device his physician ordered and by failing to provide residential services in the least restrictive setting within ninety days of those needs being identified?

Plaintiffs stated that Kobe's physicians have ordered a wheelchair and speech device, but DHHS has failed to provide this equipment with reasonable promptness. Plaintiffs requested the court order Defendants to immediately provide Kobe with (1) a wheelchair to be provided within thirty days without further administrative delays, and (2) a speech device ordered by his physician within thirty days and speech services determined by his physician to be medically necessary, based on the evaluation by his licensed speech and language pathologists.

(3)     Have the Defendants violated the integration mandate of the Americans with Disabilities Act by failing to provide Kobe with a wheelchair, a speech device, speech therapy services and placement in a supervised apartment with necessary support services?

Plaintiffs stated: "Kobe requests that this Court issue a declaratory order finding that Defendants have violated the ADA in the operation of their programs and enjoining them from continuing to violate the ADA. He requests that DHHS be ordered to pay for the wheelchair and

speech device ordered by his physician to be funded by Defendants. He requests continued speech services to improve his ability to communicate."

The court issued an order and opinion on September 30, 2014, concluding as follows:

A.     Mootness

It is well settled that federal courts have no authority to "'give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  Int'l Coal. for Religious Freedom v. Maryland, 3 F. App'x 46, 48-49 (4th Cir. 2001) (quoting Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992)).  This is so even though such case presented a justiciable controversy at an earlier point in time and an intervening event rendered the controversy moot.  Id. (citing Calderon v. Moore, 518 U.S. 149, 150 (1996)).

In this case, Plaintiffs were informed in 2010 that they no longer qualified for ADHC assistance.  However, their ADHC services were never interrupted, and they both prevailed during the administrative appeals process.  Further, it appears that Kobe has received a new wheelchair.  The court finds these claims to be moot.

B.     Ripeness

The ripeness doctrine aims to "'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies.'"  Pasby v. Delia, 709 F.3d 307, 317 (4th Cir. 2013) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)).  A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact "'remains wholly speculative.'"  Doe v. Virginia Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013) (quoting Gasner v. Bd. of Supervisors, 103 F.3d 351, 361 (4th Cir. 1996)). In determining ripeness, a court must "'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.  A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'"  Id. (quoting Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006)).

Mark's contention that the reduction in his respite hours could lead to the loss of care by his sister is too remote and speculative to be ripe for federal judicial review.  See Charter Fed. Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208-09 (4th Cir. 1992) ("'[I]n the context of an administrative case, there must be

'an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties.'")(quoting <u>Pac. Gas & Elec. v. Energy Res. Comm'n</u>, 461 U.S. 190, 200 (1983)).

C.    <u>Standing to Invoke Injunctive Relief</u>

To satisfy Article III's case-or-controversy standing requirements, a plaintiff must show (1) he has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180 (4th Cir. 2000) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). The standing question is whether the plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." <u>Warth v. Seldin</u>, 422 U.S. 490, 498-99 (1975) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)). Further, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." <u>Id.</u> at 499 (citing cases). In addition, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Id.</u> (citing cases). "Without such limitations– closely related to Art[icle] III concerns but essentially matters of judicial self-governance–the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." <u>Id.</u> at 500 (citing <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. 209, 222 (1974) ("'The desire to obtain sweeping relief cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks.'") (quoting <u>McCable v. Atchison, T. & S.F.R. Co.</u>, 235 U.S. 151, 164 (1914)).

As can readily be discerned from the allegations set forth hereinabove, and further as argued in the hearing, Plaintiffs allege systemic failures within the DHHS and DDSN systems and ask the court to intervene in the administration and operation of these agencies of the State of South Carolina. In particular, Plaintiffs seek to have the court oversee DHHS's promulgation of regulations that Plaintiffs contend would force compliance with federal Medicaid law. While Plaintiffs' allegations of wholesale mismanagement and, indeed, criminal conduct within

DHHS, DDSN, and the Babcock Center are sobering,"[i]t is an established principle . . . that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as a result of that action." <u>Lujan</u>, 504 U.S. at 574-76. Plaintiffs show no cognizable particularized injury. Plaintiffs lack standing to seek injunctive relief on behalf of others regarding the allegations of mishandling of funds and exploitation set forth in the amended complaint.

ECF No. 296.

Plaintiffs timely filed a notice of appeal. On December 15, 2016, the Court of Appeals for the Fourth Circuit affirmed in part, vacated in part, and remanded the action. ECF No. 368. First, the Fourth Circuit affirmed the court's rulings as to Mark on ripeness grounds. <u>Id.</u> at 33, n.21. Next, the Fourth Circuit affirmed the court's determination that the eligibility to receive ADHC services is moot based on the consent orders entered into with these Plaintiffs. <u>Id.</u> at 37.

The Fourth Circuit determined, however, that there was a "pattern of allegedly unreasonable delays and improper denials" with respect to Kobe's wheelchair and ACD entitlement. The Fourth Circuit found that Defendants "have not met their 'heavy burden' of showing that after this litigation has concluded, Kobe will not once again find himself without the equipment he needs and without any ability to obtain it without significant delay." <u>Id.</u> at 39. Therefore, the Fourth Circuit vacated the court's order on justiciability grounds, and remanded for further proceedings. <u>Id.</u> In addition, the Fourth Circuit determined that, since the case continues to present justiciable issues, it would vacate the grant of summary judgment against Plaintiffs on Counts One through Seven and remand for further consideration of the viability of each of Plaintiffs' claims against each Defendant. <u>Id.</u> at 40.

Finally, the Fourth Circuit turned to Judge Cain's order dismissing Defendant Haley on the basis of Eleventh Amendment immunity.[6]  The Fourth Circuit found that Judge Cain properly ruled Defendant Haley lacked the special relation to the administration of the South Carolina's Medicaid program such that no effective prospective relief would be available as against her. However, the Fourth Circuit found that Plaintiffs had not specifically waived their claim against Defendant Haley for damages.  As a result, the Fourth Circuit vacated the dismissal of Count One as against Defendant Haley.  The Fourth Circuit noted that no party had addressed the application of United States v. Georgia, 546 U.S. 151 (2006), with respect to whether Congress validly abrogated South Carolina's Eleventh Amendment immunity as to claims arising out of Title II of the ADA.  The test under Georgia instructs the lower courts to:

> [D]etermine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

546 U.S. at 159.

Thus, the Fourth Circuit held that dismissing Counts One and Two against Defendant Haley on Eleventh Amendment grounds was premature.  ECF No. 368, 50.

* * *

This matter now is before the court on the following motions:

---

[6] The Fourth Circuit observed that Plaintiffs had not appealed the dismissal of Defendants Loftis, White, and Sanford.  The Fourth Circuit also noted that Plaintiffs offered no specific challenge to the dismissal of Leatherman, Eckstrom, Chellis, and Cooper regarding prospective relief, and that Plaintiffs abandoned any claims for damages as to these Defendants. Accordingly, the orders granting these Defendants' motions to dismiss remain in effect.  ECF No. 368, 40, 43 & 55.

1. Motion for summary judgment on remand filed by Defendants Buscemi, Butkus, Chorey, Huntress, Lacy, Laurent, and Waring on April 28, 2017, and amended on August 8, 2017. Plaintiff Kobe filed responses in opposition on September 14, 2017 and September 17, 2017, and amended October 3, 2017, to which these Defendants filed a reply on October 17, 2017.

2. Motion to dismiss filed by Defendant McMaster (formerly Haley) on May 1, 2017, and amended on July 21, 2017. Plaintiff Kobe filed responses in opposition on September 14, 2017 and September 17, 2017, and amended October 3, 2017, to which Defendant McMaster filed a reply on August 16, 2017.

3. Motion for summary judgment filed by Defendant Leitner on August 11, 2017. Plaintiff Kobe filed responses in opposition on September 14, 2017 and September 17, 2017, and amended October 3, 2017, to which Defendant Leitner filed a reply on October 27, 2017.

4. Motion for summary judgment filed by Defendants Forkner and Keck on August 11, 2017. Plaintiff Kobe filed responses in opposition on September 14, 2017 and September 17, 2017, and amended October 3, 2017, to which Defendants Forkner and Keck filed a reply on October 17, 2017.

5. Third motion for summary judgment filed by Defendants Babcock Center and Johnson on August 11, 2017. Plaintiff Kobe filed responses in opposition on September 14, 2017 and September 17, 2017, and amended October 3, 2017, to which these Defendants filed a reply on October 27, 2017.

6. Motion for summary judgment filed by Kobe on August 21, 2017, to which Defendant McMaster filed a response in opposition on September 8, 2017; Defendants Forkner and Keck on September 13, 2017, Defendants Buscemi, Butkus, Chorey, Huntress, Lacy, Laurent, and Waring on September 14, 2017; Defendants the Babock Center and Johnson on September 14, 2017; and Defendant Leitner on September 14, 2017. Plaintiff filed replies to responses of Defendants McMaster; Fortner and Keck; Buscemi, Butkus, Chorey, Huntress, Lacy, Laurent, and Waring on October 27, 2017; and replies to responses of Defendants Leitner; and Babock Center and Johnson on October 28, 2017.

7. Motion to strike Plaintiff's motion for summary judgment filed by Defendants Babcock Center and Johnson on October 27, 2017. Plaintiff filed a response in opposition on November 13, 2017, to which these Defendants filed a reply on November 29, 2017.

## PLAINTIFFS' CAUSES OF ACTION[7]

### COUNT ONE
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

260.   Plaintiffs and Class Members[8] adopt and restate the allegations set forth above in this complaint.

261.   It is undisputed that Plaintiffs are qualified individuals with disabilities who have physical and/or mental impairments that substantially limit one or more of their major life activities, including, but not limited to one of more of the following: thinking, walking, communicating, learning, working, caring for themselves and concentrating.  See 42 U.S.C. § 12102.

262.   The treating professionals of the State have determined that community-based treatment is appropriate for the Plaintiffs and Class Members; they do not oppose community placement and their needs can be reasonably accommodated without fundamentally altering the nature of how the State delivers services.

263.   Public entities, like the SCBCB, the South Carolina General Assembly, SCDHHS, SCDDSN, the Babcock Center and local DSN Boards are required by federal law to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, except where the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.  28 CFR § 35.130(b)(7).

264.   Defendants who were members of the South Carolina Budget and Control Board in 2009 violated the ADA by failing to insure that the funds paid to SCDDSN were spent appropriately for services Plaintiffs and Class Members need, despite repeated warnings from the South Carolina Legislative Audit Council, federal and state audits showing that SCDDSN was spending those funds to purchase real estate to force waiver participants into WAC's to profit the State.

---

[7] Excluding Count Eight, which has been resolved.

[8] Plaintiffs elected not to proceed with a class action.

265. Defendants have failed to consider the State's obligations under the ADA in allocating funds necessary to provide necessary community based services to Plaintiffs and Class Members to allow them to receive services in the most integrated setting appropriate to their treatment needs.

266. Defendants have failed to consider their obligations to the Plaintiffs and Class Members under the ADA by expending tens of millions of dollars unnecessarily to purchase and renovate real property used as WAC's which properties are being utilized to financially exploit persons who have disabilities.

267. Defendants have acted to terminate the ADHC services of the Plaintiffs and Class Members and to reduce other services needed by Medicaid waiver participants which are necessary to allow them to live in the least restrictive setting.

268. These actions were taken without conducting a cost analysis to determine the cost of alternative services, including, but not limited to the cost of WAC services and the real estate funded by SCDDSN.

269. In doing so, Defendants have been indifferent to the medical, emotional and other treatment needs of the Plaintiffs and Class Members and to the full costs of operating the WAC's owned by local DSN Boards.

270. The treating physicians of the Plaintiffs and Class Members have determined that ADHC services are medically necessary and the Defendants have failed to give deference to the treatment orders of their treating physicians in violation of the mandate of the United States Supreme Court in *Olmstead v. L.C.* 527 U.S. 581 (1999).

271. Under the "integration mandate" of Title II of the ADA, Defendants must administer long-term care services in a manner that provides services to individuals who have disabilities in the most integrated setting appropriate to their needs.

272. Services provided in WAC's are not appropriate to the needs of the Plaintiffs and Class Members.

273. The actions taken by Defendants discriminate against persons whose physicians have determined that they require ADHC, by denying services that are appropriate to their needs.

274. The State's unjustified attempts to force these persons into WAC's place them at risk of institutionalization, including hospitals, nursing homes and ICF/MR's and it constitutes a form of discrimination based on disability which is prohibited by Title II, 42 U.S.C. § 12101(a)(2), (5).

275. The arbitrary determinations made by DSN Service Coordinators, who are acting on directives from Defendant Kathi Lacy and other individual Defendants for economic gain, will force the Plaintiffs and Class Members into inappropriate placements where their health and safety will be endangered at greater costs to taxpayers of the State.

276. The services Plaintiffs and Class Members request are not unreasonable, given the demands on the State's health care budget and the resources available to pay for these services and the ADHC services Plaintiffs request cost less than placement in a hospital or an SCDDSN Regional Center.

277. The Plaintiffs' needs can be reasonably accommodated, as has been demonstrated by their continuous care in the community while receiving ADHC services for many years.

278. Providing the ADHC services Plaintiffs request would not place an unreasonable burden on the State nor would it force the state to fundamentally alter the nature of its programs.

279. ADHC services ordered by Plaintiffs's and Class Members' physicians can be provided without undue burden to the state, taking into consideration its obligation to provide health care and services with an "even hand."

280. Defendants have further violated the ADA by denying Kobe's requests for an ACD and his choice to move to a less restrictive setting and by reducing Mark's respite services, which are all needed for him to remain out of an institutional setting.

281. Defendants have failed to make reasonable modifications to the programs operated by SCDDSN which are necessary for Plaintiffs to receive services in the least restrictive setting.

282. The failure to offer Plaintiffs and Class Members services, including, but not limited to ADHC services, to allow Plaintiffs to live in integrated home and community based settings constitutes unlawful discrimination in

violation of Title II of the ADA and its implementing regulations at 28 C.F.R. § 35.130(d).

283.    Defendants have failed to exercise their discretion in a non-discriminatory manner by denying Plaintiffs necessary funds used to provide the ADHC services they require to live the least restrictive setting.

284.    The willful and intentional acts of the individual Defendants have placed the Plaintiffs and Class members at risk and caused them to experience extreme emotional distress and fear of retaliation for filing this lawsuit in violation of the andti-retaliation provisions of the ADA.

285.    Plaintiffs request a finding that Defendants have violated the ADA and its implementing regulations and an order requiring that Defendants pay attorney fees, expenses and costs and damages in such amount as the Court shall determine to be just and fair.

## COUNT TWO VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

286.    Plaintiffs adopt and restate the allegations set forth above in this complaint.

287.    Section 504 of the Rehabilitation Act of 1973 provides, "no otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a),

288.    "Program or activity' includes a department, agency, special purpose district, or other instrumentality of a State or local Government. 29 U.S.C. § 794(b)(1)(A).

289.    The Medicaid Waiver programs administered by SCDDSN are "programs or activities" provided by the State of South Carolina.

290.    "Recipient" of federal financial assistance also includes any public or private agency or other entity to which Federal financial assistance is extended directly or through another recipient. 28 C.F.R. § 41.3(d).

291.    SCDHHS, SCDDSN, local DSN Boards and the Babcock Center are all recipients of federal financial assistance.

292.   Regulations implementing Section 504 require a recipient of federal financial assistance to administer its services, programs, and activities in the "most integrated setting appropriate" to the needs of qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

293.   Federal Medicaid funds account for a majority (nearly 80% when this lawsuit was filed) of the cost of the home and community based waiver programs administered by SCDDSN.

294.   Defendants and their contracting agencies and organizations are recipients of Federal financial assistance under Section 504 and its implementing regulations.

295.   Plaintiffs are "qualified persons with disabilities" within the meaning of Section 504 because they have physical and/or mental impairments that substantially limit one or more major life activities, and they meet the essential eligibility requirements for the home and community based waiver programs administered by SCDDSN. See 29 U.S.C. § 705(9).

296.   The treating physicians of the Plaintiffs and Class Members have determined that  ADHC services are provided in the "most integrated setting appropriate" to their medical needs as qualified individuals with disabilities. 28 C.F.R. § 41.51(d).

297.   The South Carolina Budget and Control Board failed to insure that the funds allocated to SCDDSN were spent as appropriated by the General Assembly

to provide services, despite warnings from the South Carolina Legislative Audit Council that SCDDSN was spending those funds improperly for the purchase of real estate.

298.   Defendants have threatened to terminate funds necessary for Plaintiffs and Class Members to receive services in the most integrated setting appropriate to meet their needs in order to financially exploit them.

299.   Defendants have failed to make reasonable modifications to home and community based waiver programs to allow Plaintiffs and Class Members to receive ADHC services and other home and community based waiver services so that they can successfully live in the least restrictive setting appropriate to their needs.

300. Failure to provide services in the least restrictive setting appropriate to the needs of Plaintiffs and Class Members and forcing them to attend WAC's, where they will be financially exploited, constitutes unlawful segregation in violation of Section 504 of the Rehabilitation Act and its implementing regulations at 28 C.F.R. 42.51(d).

301. The individual Defendants, Buscemi, Lacy, Waring, Huntress, Chorey and Johnson have acted willfully together and with others in intentional disregard of the federal rights of the Plaintiffs and Class Members in willful and intentional violation of Section 504.

302. Defendants have also utilized criteria and methods of administration that subject Plaintiffs to discrimination on the basis of disability, including risk of unnecessary institutionalization, by (1) failing to assess properly the services and supports that would enable Plaintiffs to live in the least restrictive setting, (2) failing to ensure that Plaintiffs have access to Medicaid-covered services that will meet their needs in the community, and (3) compelling health care providers to reduce or eliminate recommended ADHC services, thereby violating Section 504 and its implementing regulations.

303. Because of the willful and intentional acts of the individual Defendants, the Plaintiffs and Class Members have experienced extreme emotional distress due to fear of loss of services which their physicians have determined to be medically necessary and fear of harm if they are forced to attend a WAC.

304. Class Members have been subjected to extreme emotional distress when they were forced to attend WAC's with little to no notice or opportunity to appeal these decisions.

305. Plaintiffs have experienced fear of retaliation for filing this lawsuit and for advocating for their rights.

306. Defendants have violated Section 504 by failing to provide Kobe with an ACD and services in an apartment setting and they have violated Mark's right to receive respite services at the pre-January 1, 2010 level and other cost effective home and community based waiver services that allow waiver participants to live in the least restrictive setting.

307. Plaintiffs and Class Members request a finding that Defendants have violated Section 504 and its implementing regulations and that Defendants

pay attorney fees, expenses and costs and such other damages to the Plaintiffs and Class Members, including damages for emotional distress, in such amount as the Court shall determine to be just and fair.

308. Plaintiffs and Class Members are entitled to reasonable legal fees, costs and expenses of this litigation.

COUNT THREE VIOLATION OF 42 U.S.C. § 1983

309. Plaintiffs adopt and restate the allegations set forth in the paragraphs above.

310. At all relevant times herein, Plaintiffs and Class Members have had a right under the Medicaid Act to receive ADHC.

311. Defendants Haley, Sanford, Cooper, Eckstrom, Chellis, Leatherman, Forkner, Keck, Butkus, Laurent, Buscemi, Lacy, Waring, Chourey, Huntress, Johnson and Leitner are persons who, acting under color of law, have violated the civil rights of the Plaintiffs and Class Members by violating provisions of the Medicaid Act and the constitutional rights of the Plaintiffs and Class Members.

312. Defendants Butkus, Laurent, Buscemi, Lacy, Waring, Huntress, Chorey and Johnson and others who will be identified during discovery schemed to divert funds from ADHC services to WAC's and to deny the rights of Plaintiffs and Class Members to these and other Medicaid services needed to live in the least restrictive setting.

313. Acting under the color of law, Defendants worked a denial of the rights and privileges of Plaintiffs and Class Members which are secured by the United States Constitution or by Federal law and which are guaranteed by the Fourth,
Fifth, and Fourteenth Amendments to the Constitution of the United States,

to wit, they have denied their right to life, liberty and the pursuit of happiness by denying ADHC services ordered by their physicians in order to effectively force them into unsafe and inappropriate WAC's.

314. As a result of the concerted unlawful and malicious conduct of Defendants Forkner, Buscemi, Lacy, Waring, Chorey, Huntress and Johnson, Plaintiffs and Class Members have been deprived of their rights to equal protection of all the laws and to due process of law, their right to property interests in

Medicaid benefits, and the due course of justice has been impeded, in violation of the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

315. Individual Defendants Buscemi, Lacy, Waring, Chorey, Huntress and Johnson have neglected the needs of Plaintiffs and Class Members and they have done so with evil motives and intents and their actions have involved reckless and callous indifference to the rights of the Plaintiffs and other Class
Members.

316. Defendants Johnson and other employees of the Babcock Center have caused Kobe to suffer physical injury and mental anguish and their actions have resulted in unrepairable damage to his wheelchair.

317. In order to prevent Kobe from exercising his right of free speech, Defendants have violated his right to receive an ACD (assistive communications device) with reasonable promptness, as is required by 42 U.S.C. § 1396a(a)(8).

318. Defendants have recklessly and callously refused to provide Kobe with the supports he would need to live in a less restrictive setting.

319. Defendants have recklessly and callously reduced the respite services Mark needs to remain in the home of his sister and they have threatened to terminate ADHC services of waiver participants across the State.

320. All of the Defendants have acted with reckless or callous indifference to the federally protected rights of Plaintiffs and Class Members, thereby placing the health and even the very lives of Plaintiffs and Class Members at risk.

321. Plaintiffs and Class Members and their families have been subjected to fear of harm, shock, and emotional scarring, as well as fear of reprisal and of bodily harm, which are all compensable as emotional distress, and other damages.

322. Plaintiffs and Class Members demand judgment for the violation of their civil rights against all the Defendants, jointly and severally, for actual, general, special, compensatory damages in an amount to be determined by a jury and further demands judgment against all Defendants, jointly and severally, for punitive damages in an amount to be determined by the jury,

plus the costs of this action, including attorney's fees, and such other relief deemed to be just, fair, and appropriate.

323.   Punitive damages are recoverable in a 42 U.S.C. § 1983 suit where defendant's conduct is motivated by an evil motive or intent, or where it involves reckless or callous indifference to plaintiff's federally protected rights.

COUNT FOUR VIOLATION OF 42 U.S.C. §§ 1983 and 1988 (violation of civil rights)

324.   The Plaintiffs and Class Members repeat and reallege and incorporate by reference the allegations set forth above with the same force and effect as if herein set forth.

325.   At all relevant times herein, Plaintiffs and Class Members had a right under the Medicaid Act, the ADA and Section 504 to receive ADHC services and other home and community based services which are necessary for them to live in the least restrictive setting. 326.The Defendants are persons who, acting under color of law, have violated the civil rights of the Plaintiffs and Class Members by denying their rights to receive these services and attempting to force them into WAC's, where their health and safety will be jeopardized and their life and liberty will not be protected.

327.   Defendants and other persons who may be identified during discovery, have caused Plaintiffs and Class Members to be denied services, including, but not limited to ADHC services, which they are entitled to receive to enable them to live in the least restrictive setting.

328.   Defendants have failed to assure that funding necessary to protect the health and welfare of Plaintiffs and Class Members, as is required by the Medicaid Act and its regulations,  has been spent as allocated and intended to provide ADHC and other home and community based waiver services.

329.   All of the Defendants have failed to act with reasonable promptness upon findings of the South Carolina Legislative Audit Counsel showing that funds allocated for community based services have been diverted instead to purchase unnecessary real estate, thus allowing DDSN to continue the unbridled spending of taxpayer dollars to purchase more real estate instead

of using available resources in compliance with the ADA, Section 504 and the Medicaid Act to prevent hospitalization and institutionalization and to allow waiver participants to function with the most independence possible.

330.     Defendants have violated the rights of Plaintiffs and Class Members to life and liberty in violation of the due process requirements of the United States Constitution by attempting to force them into WAC's for the financial benefit of state agencies, local DSN Boards and the Babcock Center and by refusing to provide other medically necessary services, as determined by their treating physicians.

331.     Defendants have violated the free choice of providers granted to Plaintiffs and Class Members by the Medicaid Act, instead, attempting to force them to use inappropriate services provided by the Babcock Center, SCDDSN and its local Boards. 332.Defendants along with other persons who may be identified during discovery, have schemed to divert funds from ADHC services to WAC's so as to financially benefit the Babcock Center and local DSN Boards and to exploit the Plaintiffs and Class Members in conscious disregard for their rights and privileges which are secured by the United States Constitution or by Federal law and which are guaranteed by the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

333.     Defendants have failed to inform Plaintiffs and Class Members of other feasible Medicaid services which they are entitled to receive with reasonable promptness as is required by the Medicaid Act and its regulations.

334.     Defendants have failed to establish reasonable standards for the operation of the Medicaid waiver programs administered by SCDDSN pursuant to 42 U.S.C. § 1396a(a)(17) and other federal laws and regulations and they have failed to require SCDDSN to promulgate regulations as required by the South Carolina Administrative Procedures Act to establish reasonable and fair rules for the provision of services to Plaintiffs and Class Members.

335.     As a result of these practices, policies for waiver programs and services are set by Defendants without meaningful public review or meaningful public input.

336.     Defendants have violated the free choice of providers of Plaintiffs and Class Members by failing to inform them of feasible alternatives and by obstructing their choices of providers while attempting to maintain the

monopoly of services provided by SCDDSN, its local DSN Boards and the Babcock Center in violation of 42 U.S.C. § 1396a(a)(23).

337. Defendants have violated the equal access provisions of the Medicaid Act by failing to make services available to waiver participants as they are available to the general public.

338. Specifically, and in addition to the violations described above, Defendants have violated Kobe's civil rights which are enforceable under 42 U.S.C. § 1983 because they have failed to protect him from abuse and neglect, have failed to provide him with an augmentative communications device (ACD) and residential services in a less restrictive and more integrated setting with reasonable promptness.

339. Kobe is unable to communicate verbally because of his profound speech impediment due to cerebral palsy, but he would be able to communicate using augmentative communications device (ACD) which would allow him to speak using eye control, head tracking and multiple types of switches which can be attached to his wheelchair headrest. 340.As the federal district court recognized in ordering the state to pay for an ACD for a Medicaid participant with disabilities similar to Kobe's, in *Fred C. v.Texas Health and Human Services Com'n:* "The inability to speak can be the single most devastating aspect of any handicap." 988 F.Supp. 1032 (W.D.Tex. 1997).

341. Defendants have failed to provide Kobe with a functional wheelchair with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8).

342. DHHS has failed to provide Kobe with medically necessary services and equipment with reasonable promptness, as is required by 42 U.S.C. § 1396a(a)(8), the ADA and Section 504.

343. In *Meyers v. Reagan*, the Eighth Circuit, found the plaintiff to be entitled to Medicaid funding for an ACD because the primary goal of Medicaid is to provide services to help the recipient "attain or retain capability for independence or self-care." *Id*. at 243 (citing 42 U.S.C. § 1396).

344. Medicaid regulations specifically state that the benefits provided must include services recommended "for maximum reduction of physical or mental disability and restoration of a recipient to his best possible function level." 42 C.F.R. § 440.130(d) (1996).

345.    In order for Kobe to be restored to his best possible function level, it is necessary for him to be able to communicate effectively with others. See *Fred C. v. Texas Health and Human Services Com'n*, 988 F.Supp. 1032 (W.D.Tex. 1997).

346.    This equipment is needed in order for Kobe to communicate with other persons in order to be more fully integrated into the community and to communicate his needs clearly with his health care providers.

347.    These ACD's are funded by Medicaid in at least 47 states.

348.    42 U.S.C. § 1396a(a)(8) requires the State to provide Medicaid services and equipment with reasonable promptness and Medicaid regulations require the State to establish reasonable standards, as required by 42 U.S.C. § 1396a(a)(17), and to communicate those standards promptly to Medicaid participants.

349.    Medicaid regulations require SCDDSN and SCDHHS to establish eligibility for Medicaid funded devices within 90 days of the request and to provide a notice of a right to a fair hearing when such requests are denied or the device is not provided with reasonable promptness.

350.    There is no other method for Kobe to communicate effectively other than using an ACD and providing an ACD would not fundamentally alter the State's programs.

351.    On January 1, 2010, Defendants eliminated speech and language therapy as a ID/RD Medicaid waiver service based on false claims of a lack of funding, making it nearly impossible for Kobe and other persons who need ACD's to receive the speech assessment needed to obtain an order for the devices.

352.    Termination of speech and language, physical therapy and occupational therapy has jeopardized the health and well being of waiver participants in violation of the Medicaid Act, which requires them to assure CMS that their health and welfare be protected.

353.    Kobe will need speech therapy to learn to use the device and to communicate his needs using the device.

354.    Mark has been denied needed respite services based on DDSN's and DHHS' false claims of inadequate funding which were sent via U.S. Mail to CMS.

355. Upon information and belief, SCDDSN has continued to bill Medicaid the same amount, or more, for respite services, despite having shifted the costs of liability insurance, worker's comp and unemployment to the families of waiver participants.

356. As a result of Defendants' concerted unlawful and malicious conduct, Plaintiffs and Class Members have been deprived of their rights to equal protection of all the laws and to due process of law, to their right to property interests in Medicaid benefits, and the due course of justice has been impeded, in violation of the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

357. Plaintiffs and Class Members have been subjected to fear of harm, shock, and emotional scarring, which are all compensable as emotional distress, and other damages.

358. Defendants Butkus, Forkner, Laurent, Buscemi, Lacy, Waring, Chorey and Johnson have acted with an evil motive or intent to deny services Plaintiffs and Class Members are entitled to receive in order to financially benefit themselves and their organizations.

359. The Defendants have acted with reckless or callous indifference to the federally protected rights of Plaintiffs and Class Members, causing funding allocated to provide Medicaid services to "lapse" or to be paid to a rainy day account, thus losing hundreds of millions of matching federal dollars.

360. Wherefore, Plaintiffs and Class Members demand judgment for the violation of their civil rights against all the Defendants, jointly and severally, for actual, general, special, compensatory damages in the amount determined by a jury and further demands judgment against all defendants, jointly and severally, for punitive damages in an amount to be determined by the jury, plus the costs of this action, including attorney's fees, and such other relief deemed to be just, fair, and appropriate.

361. Plaintiffs and Class Members request punitive damages, as awarded by a jury, because these Defendants' conduct has been motivated by an evil motive or intent, and it has involved reckless or callous indifference to plaintiffs' federally protected rights.

COUNT FIVE VIOLATION OF 42 U.S.C. § 1985(3) (conspiracy)

362.    The Plaintiffs and Class Members repeat and reallege and incorporate by reference the allegations set forth above with the same force and effect as if herein set forth herein.

363.    The individual Defendants Buscemi, Forkner, Lacy, Waring, Chorey and Johnson, together with other unnamed persons who may be identified during discovery, have acted in their individual and official capacities, under color of law to participate in a conspiracy for the purpose of depriving the Plaintiffs and Class Members, either directly or indirectly, the equal protection of the laws or of equal privileges and immunities under the laws.

364.    These Defendants committed overt acts in furtherance of the conspiracy, thereby injuring the Plaintiffs and depriving them of services which constitute a property right, in order to deprive them of constitutionally protected rights and privileges.

365.    The conspiratorial purpose was financial and Defendants have acted in concert to deny the civil rights of the Plaintiffs and other Class Members by attempting to prevent them from receiving ADHC services and other waiver services they are entitled to receive in furtherance of the monopoly maintained by the Babcock Center, SCDDSN and its local DSN Boards.

366.    The first steps in the conspiracy were taken when DDSN spent millions of dollars which had been allocated by the General Assembly to provide Medicaid waiver services to persons who have disabilities to purchase real estate used as WAC's instead.

367.    Instead of requiring the Defendants to use funds paid by the state and federal governments to provide appropriate services, Defendants allowed SCDDSN to use these funds to continue to purchase real estate that is unnecessary, and indeed is, in some cases, harmful to Participants and Class Members.

368.    The individual Defendants named in this Court have been working in concert since 2005 to use funds allocated for services in ways not intended by the legislature, using those funds to purchase unnecessary real estate in furtherance of the illegal monopoly of DSN Boards (and entities like the Babcock Center which are treated by DDSN as a local Board).

369. The individual Defendants have acted in concert to divert funds to WAC's operated by local DSN Boards and the Babcock Center and to deny ACHC benefits to which Plaintiffs and Class Members are entitled to receive as a result of their disabilities.

370. Actions taken by the Defendants have proximately caused injury to Plaintiffs by denying services which they need to live in the least restrictive setting in the community.

371. Instead, Defendants have redirected state and federal funds to be used for improper purposes without regard for the negative consequences to the intended beneficiaries.

372. Defendants, acting under color of state law, have acted in concert to deprive Plaintiffs of benefits which they are entitled to receive under the reasonable promptness (42 U.S.C. §1396(a)(8)), free choice (42 U.S.C. §1902(a)(23)); comparability (42 U.S.C. §1902(a)(10)); reasonable standards (42 U.S.C. § 1396a(a)(17)) and equal access (42 U.S.C. §1396a(a)(30)) provisions of the Social Security Act.

373. Plaintiffs and Class Members request damages to be determined by a jury, an injunction and payment of legal fees, costs and expenses.

COUNT SIX VIOLATION OF SUPREMACY CLAUSE

374. The Plaintiffs and Class Members repeat and reallege and incorporate by reference the allegations set forth above with the same force and effect as if herein set forth.

375. States are not required to participate in Medicaid waiver programs, but once they accept Medicaid funds, states are required to comply with all federal laws, rules and regulations.

376. Defendants have violated the following provisions of the Medicaid Act, in violation of the Supremacy Clause of the United States Constitution: reasonable promptness (42 U.S.C. §1396(a)(8)), free choice (42 U.S.C. § 1396(a)(23)); comparability (42 U.S.C. § 1396(a)(10)); reasonable standards (42 U.S.C. § 1396a(a)(17)) and equal access (42 U.S.C. §1396a(a)(30)) provisions of the Social Security Act.

377. Plaintiffs and Class Members pray for an order requiring Defendants to immediately comply with the Medicaid Act and to pay for attorney fees, costs and expenses of this action and to pay the Plaintiffs and Class Members such amounts as the Court shall determine to be just.

COUNT SEVEN VIOLATION OF RICO

378. Plaintiffs reallege and incorporated by reference the paragraphs contained above.

379. Defendants Haley, Sanford, Butkus, Laurent, Forkner, Lacy, Waring, Chourey and Johnson, together with other persons who will be identified during discovery, have engaged in enterprises to operate WAC's in order to financially exploit Plaintiffs Members by paying them subminimum wages

so as to profit their agencies or themselves.

380. These Defendants, together with persons who will be identified during discovery, have diverted Medicaid and state taxpayer funds to these "industrial centers" or WAC's which constitute an enterprise for purposes of
RICO.

381. In furtherance of this scheme, Defendants have engaged in wire fraud through the use of telephones and email and have used the United States Mail.

382. SCDDSN has received income from WAC's and the Babcock Center and other named defendants have received income from these enterprises, as well as funds from SCDDSN to purchase real estate in furtherance of this scheme.

383. Upon information and belief, Defendant Lacy and others who will be identified during discovery have retaliated against persons who have exposed the misappropriation of funds by SCDDSN and by its officials, including retaliation against persons who were listed as witnesses in federal trials and she has participated in schemes to remove SCDDSN Commissioners who have inquired into this enterprise.

384. Upon information and belief, these Defendants, acting together with other persons who will be identified during discovery, have obstructed

investigations of SCDDSN, local DSN Boards and the Babcock Center and have provided false and/or misleading information to state and federal investigators.

385. In violation of 18 U.S.C. § 1503, Defendants Johnson and Lacy have impeded the investigations of deaths and serious injuries occurring at WAC's or as a result of the failure to supervise persons at WAC's.

386. In violation of 18 U.S.C. § 1512, Defendants Johnson and Lacy, together with other persons who will be identified during discovery, have knowingly used intimidation, threatened or corruptly persuaded other persons, or attempted to do so; or have engaged in misleading conduct toward other persons in an attempt to influence, delay, or prevent the testimony of those persons in an official proceeding or to cause the persons to withhold testimony, or withhold a record, document, or other object, from an official proceeding or to alter, destroy, mutilate, or conceal an object with the intent to impair the object's integrity or availability for use in an official proceeding.

387. Upon information and belief, in violation of U.S.C. § 1512, Defendants Johnson and Lacy have tampered with witnesses and threatened persons who have attempted to expose this scheme.

388. Upon information and belief, in violation of U.S.C. § 1513, these Defendants have used the United States Mail in furtherance of these schemes.

389. These Defendants have benefitted financially through increases in their salaries at taxpayer expense, at the same time that waiver services provided to severely disabled persons were being reduced due to "budget reductions" and contractual arrangements.

390. Upon information and belief, these Defendants have invested ill gotten funds in real estate used for the purpose of operating WAC's and have used funds which should have been spent providing waiver services to increase salaries of SCDDSN officials.

391. Property rights (i.e. Medicaid benefits) of the Plaintiffs have been denied by Defendants by attempting to force them to attend WAC's where they are not safe and their medical needs would not be met.

392.    Upon information and belief, these Defendants, together with other persons who will be identified during discovery, appear to have engaged in money laundering and interference with commerce by establishing and maintaining a monopoly of services provided by the Babcock Center, SCDDSN and local DSN Boards while attempting to drive Helping Hands, Hope Bridge and other private providers of ADHC services out of business.

393.    Medicaid is an insurance program and these Defendants have filed false claims for reimbursement for Medicaid services in excess of the cost of those services, including, but not limited to paying DSN Boards and the Babcock Center millions of dollars for "vacant beds."

394.    These individual Defendants have transferred or obtained taxpayer funds by false pretenses.

395.    These Defendants have fraudulently converted the money they were in lawful possession of with fraudulent intent.

396.    Defendants have knowingly or willfully made false or fraudulent statements or representations in or with reference to applications for insurance (Medicaid).

397.    These Defendants have knowingly and willingly presented or caused to be presented statements to an insurer, a reinsurer, a producer, a broker or any agent thereof, knowing that the statement conceals or omits facts, or contains false or misleading information concerning a fact material to an application for Medicaid reimbursement.

398.    These Defendants have presented or caused to be presented statements as a part of, or in support of, a claim for payment or other benefits (Medicaid), knowing that the statement conceals or omits facts, or contains false or misleading information concerning facts material to that claim.

399.    These Defendants have assisted, aided, abetted, solicited and conspired with other persons to present or cause to be presented claims to an insurer, a reinsurer, a producer, a broker or any agent thereof, knowing that the statements concealed or omitted facts, or have provided false or misleading information concerning facts material to an application for insurance reimbursement or other benefits under such a policy.

400. These Defendants have acted or failed to act with the intent of defrauding or deceiving an insurer, a reinsurer, producer, a broker or any agent thereof, to obtain insurance reimbursements under Medicaid, which is prohibited by RICO.

401. These Defendants have acted to assist, conspire with or urge other persons to commit acts r omissions through deceit, misrepresentation or other fraudulent means.

402. These Defendants have accepted proceeding or other benefits under policies of insurance (the ID/RD Medicaid waiver document), knowing that the proceeds or other benefits are derived from acts or omissions.

403. These Defendants have employed persons to procure clients, patients or other persons who obtain services or benefits under a policy of insurance (Medicaid) for the purpose of engaging in acts or omissions which violate the rights of the Plaintiffs.

404. Upon information and belief, these Defendants have acted in concert to manipulate or othewise effect evaluations of medical necessity in violation of the South Carolina Medical Practice Act so as to deny payment for services which the treating physicians of the waiver participants have determined to be medically necessary.

405. The purposes of these evaluations conducted by Kathi Lacy, Judy Johnson, Jacob Chourey and others under their supervision and control has been to

deny needed Medicaid services and to defraud state taxpayers through the operation of WAC's, so as to financially exploit persons who have disabilities.

406. Plaintiffs are entitled to treble damages and Defendants should be required to repay all ill gotten gains for debts "forgiven," for real estate purchased with funds allocated to provide services to ID/RD Medicaid waiver participants and other improper uses of federal and state funds alleged herein.

407. Plaintiffs pray for payment of legal fees, costs and expenses of this action due to Defendants' violation of RICO. ECF No. 65, 45-69.

## **APPLICABLE LAW**

A. Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12165 and Rehabilitation Act.

Title 42, United States Code, Section 12132 provides:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

A "public entity" means

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

42 U.S.C. 12131(1).

Similarly, 29 U.S.C. § 794 of the Rehabilitation Act provides:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

A "program or activity" means all of the operations of--

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or

(B) a local educational agency (as defined in section 7801 of Title 20), system of career and technical education, or other school system;

(3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship–

      (i)      if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

      (ii)      which is principally engaged in the business of providing education,health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

To establish an ADA /Rehabilitation Act violation, Plaintiff must show: (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability.  Rogers v. Dep't of Health and Env. Control, 985 F. Supp. 635 (D.S.C. 1997) (quoting Adamczyk v. Chief, Baltimore County Police Dep't, 952 F. Supp. 259, 263 (D. Md. 1997)).

B.    Violation of Constitutional Rights.

Title 42, United States Code, Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  Mills v. Greenville Cnty., 586 F. Supp. 2d 480, 485 (D.S.C. 2008 (citing West v. Atkins, 487 U.S. 42, 48 (1988)).

To establish supervisory liability under § 1983, a plaintiff must show:    (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.  Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citing cases).

C.      Conspiracy To Interfere with Civil Rights.

Title 42, United States Code, Section 1985(3) provides:

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State . . . from giving or securing to all persons within such State . . . the equal protection of the laws; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

To state such a claim under 42 U.S.C. § 1985(3), a plaintiff must prove the following:

(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

A Society Without A Name v. Virginia, 655 F.3d 342, 346 (citing Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995)).  Moreover, the plaintiff must show "an agreement or a meeting of the minds by the defendants to violate the plaintiff's constitutional rights."  Id. (citing Simmons, 47 F.3d at 1377).

D.      Supremacy Clause

The Supremacy Clause, Art. VI, cl. 2, reads:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Supremacy Clause allows a plaintiff to seek declaratory and injunctive relief when federal law preempts state regulation.  United States v. South Carolina, 720 F.3d 518, 526 (4th Cir. 2013) (citing cases).

E.      Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

In U.S. Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312 (4th Cir. 2010), the Fourth Circuit stated:

To state a civil RICO claim, a plaintiff must allege that the defendants engaged in, or conspired to engage in, a *pattern* of racketeering activity." 18 U.S.C. § 1962 (emphasis added).

"Racketeering activity" includes "extortion," defined as "the obtaining of property from another,

with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. §§ 1951(b)(2) (defining extortion), 1961(1) (defining "racketeering activity" to include the offenses enumerated in § 1951).

> . . . .

> A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To demonstrate a pattern of such activity, the plaintiff must show "continuity plus relationship," i.e., "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."

Id. at 318 (citations omitted)

"In order for a civil RICO claim to survive a Rule 12(b)(6) motion to dismiss, plaintiff must allege '(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering.'" Chambers v. King Buick GMC, LLC, 43 F. Supp. 3d 575, 588 (D. Md. 2014) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). Additionally, a plaintiff must plead proximate cause, i.e., that he was injured in his business or property "by reason of" the RICO violation. Id. at 588 (quoting Hemi Group, LLC v. City of New York, 559 U.S. 1, 6 (2010)).

F.     Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550, U.S. 544, 570 (2007)). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Id. However, a complaint that pleads facts merely consistent with the liability does not sufficiently

show the claim as plausible on its face.  Id.   When analyzing a matter under Rule 12(b)(6), the court should first accept as true all of the allegations contained in a complaint.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. Second, the court must determine, drawing on its judicial experience and common sense, if a claim "states a plausible claim for relief."  Id.   The plaintiff's claims must be alleged with enough specificity to nudge the plaintiff "across the line from conceivable to plausible."  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 570).

G.    Motions for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248-49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party.  Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

## DISCUSSION

A.    Amended Motion for Summary Judgment on Remand filed by Defendants Buscemi, Laurent, Butkus, Huntress, Lacy, Waring, and Chorey (the "DDSN Defendants")

The DDSN Defendants observe that, as to them, Kobe has shown no need for prospective injunctive relief and has abandoned any damages claims, such that these Defendants are entitled to dismissal of the case against them in its entirety.  As to the merits of Kobe's allegations, the

DDSN Defendants assert that Counts One (ADA) and Two (Rehabilitation Act) essentially present the same contention that Kobe was wrongfully denied ADHC services. As noted hereinabove, the Fourth Circuit has determined this particular contention is moot because Kobe did not lose ADHC services and, further, was successful on administrative appeal.

The DDSN Defendants assert that any non-ADA or non-Rehabilitation Act claims against these Defendants in their official capacities are barred by the Eleventh Amendment. See Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989)). As to Kobe's § 1983 claims against the DDSN Defendants their individual capacities (Counts Three, Four), these Defendants argue that Kobe failed to show any specific factual allegations of wrongdoing attributable to any of the named DDSN Defendants. Regarding Kobe's claim that he was denied a wheelchair and ACD, the DDSN Defendants assert these claims are directed to the DHHS Defendants, Keck and Fortner. Regarding Count Five, the DDSN Defendants assert that Kobe's claims relate to a conspiracy to deny him ADHC services, and because such services were not denied, "obviously there could not have been a conspiracy to effect such denial." ECF No. 399-1, 11.

Regarding Count Six, the DDSN Defendants note the dearth of factual allegations in the amended complaint under this cause of action, which simply states:

> 376. Defendants have violated the following provisions of the Medicaid Act, in violation of the Supremacy Clause of the United States Constitution: reasonable promptness (42 U.S.C. § 1396(a)(8)); free choice (42 U.S.C. § 1396(a)(23)); comparability (42 U.S.C. § 1396(a)(10)); reasonable standards (42 U.S.C. § 1396a(a)(17)) and equal access (42 U.S.C. § 1396a(a)(30)) provisions of the Social Security Act.

ECF No. 65, 64.

The DDSN Defendants assert Kobe has set forth no facts showing harm to Kobe or specific acts by these Defendants that resulted in violations of enumerated sections of the Medicaid Act and Social Security Act.

Finally, regarding Count Seven, the DDSN Defendants contend that Kobe has failed to allege (1) one of the "predicate acts" set forth in 18 U.S.C. § 1961(1); (2) how, if at all, the purported activities of the criminal enterprise affected interstate or foreign commerce; or (3) any evidence Kobe suffered a business or property loss.

In his response in opposition, Kobe offers a lengthy recitation of factual allegations and appears to address only the following causes of action as to DDSN:  Count Five (conspiracy to interfere with civil rights); Count Six (Supremacy Clause),[9] and Count Seven (RICO).  Kobe does not dispute the DDSN Defendants' arguments regarding Counts One, Two, Three, and Four.  The court concludes Kobe has abandoned these causes of action as to these Defendants.

Turning to Count Five (conspiracy to deny civil rights), Kobe asserts the following in his response in opposition to the DDSN Defendants' motion for summary judgment:

> Plaintiffs have alleged that they have been deprived of services and needed equipment and due process, liberty and equal protection rights.  Kobe has demonstrated that he has suffered has suffered discrimination and [been] injured thereby as a consequence of overt acts committed by the named Defendants in connection with the conspiracy.

ECF No. 436, 34.

---

[9] The DDSN Defendants contend Plaintiff abandoned Count Six.  The court will construe Plaintiff's discussion regarding Eleventh Amendment immunity as responding to the DDSN Defendants' argument regarding the Supremacy Clause.

Kobe's argument is based on his contention that DHHS, DDSN, and other agencies have engaged in wide-spread corruption, negligence, and criminal conduct over the past decade or more. In court's view, Kobe's allegations fail to demonstrate any of the DDSN Defendants' purported mismanagement and falsification of information, if such conduct were to be proven, was motivated by a specific class-based, invidiously discriminatory animus to deprive Kobe of his rights.

Regarding Count Six (Supremacy Clause), Kobe states that the "future deterrence of violations is critically important in this case, because Plaintiffs have life long disabilities and their needs will increase as they age. Waiver participants simply cannot afford years of litigation each time they require a wheelchair, a speech device or other medically necessary services." ECF No. 436, 31-32. The Supremacy Clause is not the source of any federal rights, and does not create a cause of action. Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1383 (2015). It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so. Id. Moreover, there is no suggestion in the record by any party of a clash between state and federal law. The gravamen of Kobe's complaint is that Defendants have, in varying respects, failed to comply with the mandates in federal law in the form of the ADA, Rehabilitation Act, and Medicaid.

Finally, regarding Count Seven (RICO), Kobe asserts that he has provided "extensive documentation of conduct of an enterprise (the diversion of funds to DDSN work activity centers) through a pattern of racketeering activity." ECF No. 436, 35. Kobe asserts predicate acts to include "obtaining insurance through false pretenses, including money laundering, mail and wire fraud and intimidation of witnesses." Id. While it is true that Kobe has made allegations of corruption, his claims are speculative in nature. The court discerns no facts tending to show an

enterprise distinct from the persons alleged to have violated 18 U.S.C. § 1962 (c).  See Palmetto State Med. Ctr. v. Operation Lifeline, 111 F.3d 142, 148 (4ᵗʰ Cir. 1997).  Nor has Kobe proved that each DDSN Defendant engaged in at least two acts of racketeering activity within a ten-year period, as required by 18 U.S.C. § 1961(5).

For all these reasons, the DDSN's motion for summary judgment is **granted**.

B.      Motion to Dismiss filed by Defendant McMaster

Defendant McMaster first asserts that Kobe fails to state a facially plausible claim under Iqbal.  Defendant McMaster asserts that the amended complaint includes no allegations against the governor in Counts 1 and 2 (ADA, Rehabilitation Act).   This Defendant further observes that there are no allegations that the governor acted with deliberate indifference to any claimed violation of Kobe's rights under the ADA and/or Rehabilitation Act.  Defendant McMaster further argues that Kobe's remaining factual premises for the ADA and Rehabilitation Act involve the failure to provide him with an ACD and a functioning wheelchair with reasonable promptness.  Defendant McMaster notes that the duty to provide these devices arises from the Medicaid Act, and the Fourth Circuit has held that the governor is not liable in an official capacity for a violation of the Medicaid Act.

Defendant McMaster next contends that the governor is not a "program or activity" subject to suit under the Rehabilitation Act, nor a "public entity" subject to suit under the ADA, and thus entitled to Eleventh Amendment immunity in her official capacity.  As encouraged by the Fourth Circuit, Defendant McMaster discusses the application of United States v. Georgia, 546 U.S. 151 (2006), to the within action.  Defendant McMaster notes that Kobe must show his ADA claim independently violates the Fourteenth Amendment before state sovereign immunity is abrogated

as to the governor.  This Defendant asserts that Kobe has "failed to allege *that*, much less *how*, the Governor violated [his] Fourteenth Amendment rights.  Nor could [he] do so, because the basis for [his] Title II claim is alleged violations of the Medicaid law and implementing regulations which [he] maintain[s] contravene Title II's 'integration' mandate and Olmstead v. L.C., 527 U.S. 581 (1999)."  ECF No. 388-1, 11.  Defendant McMaster argues that violation of the Medicaid Act is not a violation of the Fourteenth Amendment, and, absent a corresponding constitutional violation, the governor is entitled in his official capacity to Eleventh Amendment immunity from suit.  See Wessel v. Glendening, 306 F.3d 203 (4th Cir. 2002).

Next, Defendant McMaster asserts there exists no case or controversy and, as a result, Kobe lacks standing.  Defendant McMaster relies on Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), wherein the Court explained:

> Our cases have established that the "irreducible constitutional minimum" of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements.  Where . . . a case is at the pleading stage, the plaintiff must "clearly . . . allege facts demonstrating" each element.

(Citations omitted).

Defendant McMaster argues that the amended complaint does not clearly allege facts demonstrating each element of standing with respect to the governor, and, even assuming Kobe could demonstrate the first and third elements, Kobe cannot establish that any alleged injury he suffered is fairly traceable to the governor.

Finally, Defendant McMaster contends that legislative immunity bars the purported ADA and Rehabilitation Act claims to the extent Kobe seeks damages from the governor for the Budget and

Control Board's 2009 vote to authorize DDSN's Commission to use excess debt service funds for purposes other than funding Medicaid. Defendant McMaster states that state law authorizes DDSN to apply to the Budget and Control Board for capital improvements of residential treatment centers or community facilities, and provides that the Budget and Control Board could issue capital improvement bonds for such improvements pursuant to S.C. Code Ann. § 44-11-1120 to - 1160. Under S.C. Code Ann. § 44-20-1170, DDSN is required to repay its obligations on outstanding capital improvement bonds from its revenue. Any revenues in excess of the payment due may be transferred to the local disabilities and special needs boards for improvements at the local level. See id. § 44-20-1170(B). Thus, according to Defendant McMaster, any decisions regarding budgetary priorities and policy positions falls within the broad sweep of legislative immunity.

In response to Defendant McMaster's motion to dismiss, Kobe reiterates his contentions that Defendants have engaged in misappropriation, corruption, fabrication of budgetary shortfalls, and improper diversion of funds to DDSN. Kobe next asserts that the Governor's Office is a "public entity" within the meaning of the ADA because an action against the governor in his official capacity is a claim against the state. Contrary to Defendant McMaster's contention that duties to Kobe to provide him with an ACD and a functioning wheelchair arise under the Medicaid Act, Kobe relies on 42 C.F.R. § 35.160 as providing an independent obligation under the ADA to provide him with a speech device, speech services, and other services in the least restrictive setting in a timely manner. Section 35.160 provides, in relevant part:

> (a)(1) A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others.
>
> . . . .

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.

(2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

Kobe also asserts that the governor is a "program or activity" within the meaning of the Rehabilitation Act because the office accepts federal funds through the Developmental Disabilities Act to operate a program to advocate for persons who have disabilities and require long term care.

Regarding the Fourth Circuit's invocation of <u>United States v. Georgia</u>, 546 U.S. 151 (2006), Kobe asserts that: (1) the state has violated the ADA by refusing to provide services he needs to live outside of a congregate residential setting and to provide needed auxiliary aids, such as an ACD and functioning wheelchair, and that he was retaliated against when reports of neglect were lodged; (2) Defendants violated his constitutional rights by: not promptly providing an ACD or functional wheelchair, failing to provide notices or hearings, denying him reasonably safe conditions of confinement, retaliating against him when reports of neglect were made by persons from his ADHC facility, all of which violated his rights to privacy and rights under the First, Fifth, and Fourteenth Amendments; and (3) his claims under Title II of the ADA that do not violate the Fourteenth Amendment survive because the ADA Amendments Act of 2008 indicated Congress's intent that the ADA abrogate sovereign immunity.

As to Defendant McMaster's contention that Kobe's complaint fails to state a claim upon

which relief can be granted, Kobe argues that the governor was responsible for providing regulatory oversight, policy development, monitoring of state finances, purchasing, personnel, and real property transactions involving state and federal funds, which funds, according to Kobe, were misused.  Kobe contends that his injuries are fairly traceable to former governors who "totally abdicated their responsibilities under the ADA and the Rehabilitation Act and violated [Kobe's] Constitutional rights,"  ECF No. 404, 27, by engaging in "schemes intended to divert funds allocated by the General Assembly to provide services in the least restrictive setting, instead to purchase real estate used to buy and renovate more facilities to house congregate sheltered workshops," id. at 28. Kobe suggests that the governors, including Defendant Haley and former Governor Mark Sanford, may have been active participants in a money laundering scheme.  Id. at 33.  Finally, Kobe asserts that the governor is not protected by legislative immunity because the acts complained of were illegal and not within the scope of the governor's authority.

As a threshold matter, the court must determine whether Congress has validly abrogated Eleventh Amendment immunity with respect to Title II of the ADA and the Rehabilitation Act. Applying Georgia, Kobe has identified a violation of the ADA in the failure to provide him with assistive devices to which he is entitled.  Kobe has further asserted that the violation of the ADA violated his constitutional rights to life, liberty, and property, and to equal protection.  Specifically, Kobe contends that he is unable to communicate with others without the ACD, which prevents him from access to the public services he is entitled.  Kobe also contends that his rights to reasonably safe conditions of confinement, freedom from bodily restrains, and to training have been disregarded.   The court concludes that Governor McMaster is not entitled to sovereign immunity with respect to Kobe's claims for monetary damages.

A review of the majority of the allegations of Counts One and Two reflect Kobe's claims of misappropriate of funds and the potential loss of ACHD services. The Fourth Circuit has affirmed the court's finding that Kobe lost no ACHD services and prevailed on administrative review. Only paragraph 280 of Count One (ADA) and paragraph 306 of Count Two (Rehabilitation Act) mention Defendants' failure to provide Kobe with an ACD or other assistive devices. For purposes of Defendant McMaster's motion to dismiss, setting aside other arguments raised by the parties, the court will assume that the governor is a public entity subject to damages under Title II of the ADA or the Rehabilitation Act. The question becomes, then, whether the governor intentionally or with deliberate indifference failed to provide meaningful access or reasonable accommodation to Kobe by denying him the use of an ACD. See Adams v. Montgomery College (Rockville), 834 F. Supp. 2d 386, 393-94 (D. Md. 2011) (noting that "'the majority of circuits that have resolved the question have held that damages may be awarded if a public entity intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons'") (internal quotations omitted) (quoting Paulone v. City of Frederick, 787 F. Supp. 2d 360, 373-75 (D. Md. 2011)). "Defendants intentionally violate the ADA and the Rehabilitation Act by demonstrating deliberate indifference when they '[have] notice of the potential risk of their decision, and clearly [refuse] the accommodation knowingly.'" Id. at 394 (quoting Proctor v. Prince George's Hosp. Ctr., 32 F. Supp. 2d 820, 829 D. Md. 1998)). A defendant need not show discriminatory animus to recover damages under Title II of the ADA or § 504 of the Rehabilitation Act. Id. (citing Paulone, 787 F. Supp. 2d at 373-74). Rather, compensatory damages are available for failure to accommodate a plaintiff if a defendant "'acted knowingly, voluntarily, and deliberately,'" even if the violations resulted from mere

"'thoughtlessness and indifference' rather than because of any intent to deny [a p]laintiff's rights." Id. (quoting Proctor, 32 F. Supp. 2d at 828).

In this case, Kobe contends that Governors Sanford and Haley were notified of his need for the equipment, but abdicated their obligations under the ADA and Rehabilitation Act to remedy the alleged violations. The court concludes that at least some of Kobe's allegations nudge the complaint across the line from conceivable to plausible with respect to the narrow issue of whether the governor is liable for damages under the ADA and Rehabilitation Act for the failure to provide Kobe with the assistive devices he requires. Defendant McMaster's Rule 12(b)(6) motion is **denied**.

C.    Motion to Dismiss and for Summary Judgment filed by Defendant Leitner

Defendant Leitner asserts that she is entitled to summary judgment as to Kobe's claim under Count Three (42 U.S.C. § 1983), the only count in which she is named. See ECF No. 65, ¶ 311. Defendant Leitner notes that the only factual allegations in the amended complaint alleges that on January 5, 2011, she, as Director of the Richland Lexington Disabilities Board, sent a letter to Kobe alerting him that a review of ADHC services was forthcoming. Defendant Leitner states that, as discussed above, Kobe was never denied ADHC services, and there are no other factual allegations of wrongdoing with respect to her that she violated Kobe's constitutional rights. Defendant Leitner also argues that she was not involved in the DHHS denials of Kobe's applications for an ACD. According to Defendant Leitner, it was through the Richland Lexington Disabilities Board that an ACD was borrowed for Kobe through the University of South Carolina Assistive Technology Program in 2013, and also through the Richland Lexington Disabilities Board that Kobe's case manager recently procured an ACD for Kobe's permanent use through the

South Carolina Vocational Rehabilitation Department. Defendant Leitner contends there is no genuine issue of material fact that she did not deprive Kobe of his constitutional or statutory rights.

In response, Kobe asserts, without competent evidence, that Defendant Leitner: (1) has failed to explain why Kobe's requests to move to a less restrictive environment were not transmitted to DDSN; (2) "made a conscious decision to inform Judy Johnson that [Kobe] intended to move from the Babcock Center, when she was asked not to share that information until the placement had been arranged. Then, she colluded with Johnson in an attempt to enlist [Kobe's] mother to prevent him from moving from a group home where he had been abused and neglected"; (3) failed to timely provide Kobe with written notices containing all of the information required by 42 C.F.R. § 431.210, likely because of "collusion with DDSN and DHHS Defendants to attempt to moot [Kobe's] lawsuit (by obtaining a 'loaner' device)." ECF No. 435-36. Kobe's "unsubstantiated allegations and bald assertions" are not adequate to defeat summary judgment. See Evans v. Tech. Application & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996).

Defendant Leitner's motion for summary judgment is **granted**.

D.     Motion for Summary Judgment filed by Defendants Keck and Forkner (the "DHHS Defendants")

Kobe alleges that the DHHS Defendants failed to provide Kobe with an ACD and wheelchair. Kobe's allegations arise under the ADA and the Rehabilitation Act (Counts One, Two, 2), 42 U.S.C. § 1983 (Counts Three, Four), conspiracy (Count Five), and RICO (Count Six).[10]

---

[10] The amended complaint also contains allegations that Kobe was denied ADHC services, in violation of his constitutional rights. Kobe's allegations regarding ADHC services are moot, for the reasons set forth hereinabove.

The DHHS Defendants first contend that Kobe cannot show he was excluded from possessing an ACD on the basis of his disability. These Defendants contend that Kobe's request was reviewed and it was determined that an ACD with pre-recorded messages, as opposed to the requested ACD that synthesized speech, would provide him with adequate speech support. According to the DHHS Defendants, Kobe chose to proceed in this court rather than the administrative appeal process regarding the DHHS Defendants' decision. The DHHS Defendants argue that the evidence shows only a difference of opinion as to the type of ACD that would be appropriate for his condition. The DHHS Defendants further contend this issue is moot because the ACD Kobe desired now has been approved and provided to him.

Regarding Kobe's wheelchair, the DHHS Defendants state that no request for a wheelchair was made to DHHS to be approved or denied. These Defendants inform the court, however, that Kobe submitted a request for a wheelchair on July 24, 2013, which was approved by DHHS on August 2, 2013. The wheelchair has been provided to Kobe. The DHHS Defendants assert that this issue also is moot.

As to Kobe's § 1983, § 1985, and RICO causes of action, the DHHS Defendants assert that the amended complaint is devoid of any factual allegations regarding actions or omissions by them aside from conclusory statements of wrongdoing, and, further, that any claims revolved around Kobe's contentions that Defendants attempted to deprive him of his right to participate in ADHC services. These Defendants also assert that Kobe cannot maintain a cause of action under the Supremacy Clause.

Kobe's specific response in opposition to the DHHS Defendant's motion for summary judgment is that, if there were a difference of professional opinions regarding the type of ACD

Kobe needed, DHHS should have sent a notice containing all information required by 42 C.F.R. § 431.201 to Kobe, and not just to the case manager and provider. Section 431.201 provides:

> (b) The agency must, at the time specified in paragraph (c) of this section, inform every applicant or beneficiary in writing -
>
> (1) Of his or her right to a fair hearing and right to request an expedited fair hearing;
>
> (2) Of the method by which he may obtain a hearing;
>
> (3) That he may represent himself or use legal counsel, a relative, a friend, or other spokesman; and
>
> (4) Of the time frames in which the agency must take final administrative action, in accordance with § 431.244(f).

The court discerns no requirement that notice be provided directly to an applicant or beneficiary. Kobe was represented by counsel who advocated on his behalf to obtain the preferred ACD. Kobe fails to state how delivering a copy of any notice to him personally creates an issue of fact that should be submitted to a jury. The DHHS Defendants' motion for summary judgment is **granted** as to Counts One (ADA), Two (Rehabilitation Act), and Counts Three and Four (§ 1983).

Kobe includes the DHHS Defendants in his argument regarding the DDSN Defendants as to Counts Five (conspiracy), Count Six (Supremacy Clause), and Count Seven (RICO). For the reasons set forth hereinabove in Section A, the DHHS Defendants' motion for summary judgment is **granted** as to these claims.

The court is mindful that the Fourth Circuit found "pattern of allegedly unreasonable delays and improper denials" with respect to Kobe's wheelchair and ACD entitlement, and that the DHHS Defendants need to show "that after this litigation has concluded, [Kobe] will not once again find

himself without the equipment he needs and without any ability to obtain it without significant delay." The DDHS Defendants represent to the court that an ACD acceptable to Kobe as well as a wheelchair have been provided to him on a permanent basis. Kobe contends that these Defendants continue to ignore the requirements of 42 U.S.C. § 1396a(a)(8) and have not provided him with services to be provided in a non-congregate setting; for speech services, including a swallow study, and for a bed that will allow him to raise the elevation of his head to prevent aspiration. According to the DDHS Defendants, these new claims lack factual basis in the record. Moreover, according to the DDHS Defendants, Kobe's request for a hospital bed was submitted for authorization on August 6, 2013, approved by these Defendants on August 12, 2013, and paid for by Medicaid on August 23, 2013. The court declines to consider Kobe's newly asserted allegations at this stage of the proceedings.

E.     Motion for summary judgment filed by Defendants Babcock Center and Judy Johnson
       (the "Babcock Defendants")

The Babcock Defendants first argue that Kobe cannot establish they violated the ADA (Count One). The Babcock Defendants state that the only claims involving them revolve around participation in the ADHC program, which issue is moot. Regarding the Rehabilitation Act (Count Two), these Defendants contend that Kobe fails to assert any specific actions taken by Johnson, in her individual capacity as she is named, to support his claim that Johnson personally discriminated against him based on his disability.

Regarding Kobe's § 1983 causes of action (Counts 3, 4), the Babcock Defendants assert that the Babcock Center is not a governmental entity acting under color of state law. In support of their assertion, these Defendants attach to their motion for summary judgment a copy of their

business filing with the South Carolina Secretary of State.  As to conspiracy to interfere with civil rights (Count Five), the Supremacy Clause (Count Six), and violations of RICO (Count Seven), the Babcock Defendants make generally the same arguments as the DDSN Defendants and the DHHS Defendants.

In his response in opposition, Kobe relies on his recitation of mismanagement and investigation into the Babcock Center, and intimates that the Babcock Defendants possessed a financial incentive to limit expenditures for assistive technology and equipment.  The court finds that Kobe's argument fails to establish discrimination on the basis of disability.  Kobe also disputes the Defendants' contention that the Babcock Center is not a governmental entity.  Although there exist situations when a private organization may be treated as a public entity, see, e.g., Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288 (2001), Kobe does not engage in the analysis.

The Babcock Defendant's motion for summary judgment is **granted** as to Counts One (ADA), Two (Rehabilitation Act), and Counts Three and Four (§ 1983).

Kobe includes the Babcock Defendants in his argument regarding the DDSN Defendants and DHHS Defendants as to Count Five (conspiracy), Count Six (Supremacy Clause), and Count Seven (RICO).  For the reasons set forth hereinabove in Sections A and D, the Babcock Defendants' motion for summary judgment is **granted** as to these claims.

F.      Motion to Strike Kobe's Response in Opposition to Motions for Summary Judgment

The Babcock Defendants contend that Kobe's omnibus response in opposition to Defendants' motions for summary judgment (excluding Defendant McMaster's motion to dismiss) should be stricken as unresponsive and relying on matters outside the record.  The Babcock

50

Defendants also assert that Kobe is attempting to relitigate matters in contravention of the Fourth Circuit's opinion. The court, having addressed the motions for summary judgment, denies the motion to strike as **moot**.

G.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs posit the following issues: (1) Defendants are in violation of the feasible alternatives, comparability and reasonable promptness requirements of the Medicaid Act that are enforceable under § 1983; (2) Defendants are in violation of the integration mandate of the Americans with Disabilities Act.

To the extent Plaintiffs raise arguments in tandem with their responses in opposition to Defendants' various motions for summary judgment (excluding Defendant McMaster's motion to dismiss), the motion for partial summary judgment is **denied** for the reasons set forth hereinabove.

To the extent Plaintiffs raise new claims not asserted in the amended complaint, the motion for partial summary judgment is denied without prejudice to allow him to raise his allegations in a new action.

To the extent Plaintiffs raise arguments barred by the mandate rule, the motion for partial summary judgment is denied.

To the extent Plaintiffs assert damages claims against Defendants (excluding Defendant McMaster), the motion for partial summary judgment is denied for the reasons set forth in the Fourth Circuit's opinion.

To the extent Plaintiffs seek injunctive relief for events occurring after the filing of the amended complaint, his motion for partial summary judgment is denied without prejudice to allow him to see injunctive relief in a new action.

<u>CONCLUSION</u>

For the reasons stated, the motion for summary judgment of the DDSN Defendants (ECF Nos. 376, 399), Defendant Leitner (ECF No. 400), the DHHS Defendants (ECF No. 402), and the Babcock Center Defendants (ECF No. 403) are **granted**. The motion to dismiss filed by Defendant McMaster (ECF Nos. 379, 388) is **denied**. Plaintiff's motion for partial summary judgment (ECF No. 411) is **denied** as set forth above. The Babcock Center Defendants' motion to strike (ECF No. 453) is **denied as moot**. To the extent not inconsistent with this order, the court restates its conclusions as contained in its September 30, 2014 order.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Senior United States District Judge


Columbia, South Carolina

March 30, 2018